We will hear argument next in No. 2009-1476, Newcor Corporation v. United States, but United Shane, when you're ready. Thank you, your honors. If you could wait just a second while we get situated here, everybody's ready. Very well. Go ahead. Here on behalf of appellants, just a couple of key points at the outset. Here the department acted consistently with the company's own books and records. The company treated the expenses in question as capitalized assets, and Commerce treated them consistently with that. Secondly, when Commerce, excuse me, when Kincheller asked the agency to walk away from the company's own books and records, the agency found that there was insufficient evidence to do that. And the CIT should not be permitted to reweigh that evidence and force a different result, which is what it did in this case. Do you think, I know that the parties disagree about the scope of either what the CIT did or even what it's authorized to do, but if you recast the CIT's characterization of the evidence below rather than saying it was uncontroverted and say instead that what the CIT did in effect is to say there was no substantial evidence to support Commerce's treatment of this account as not being foreign exchange losses not associated with a capital asset, you wouldn't under those circumstances disagree that the court had the power to do that, even though I'm sure you would disagree that it ought to do it on the facts of this case. But you wouldn't disagree with the authority of the court to act in that setting, correct? No, not necessarily, Your Honor, but that's not what happened in this case. What happened in this case, in a nutshell, is you have a very complicated accounting issue, which was before Commerce. Commerce resolved it in a certain way, and the CIT reweighed that evidence and came up with a different conclusion. There are really two key factual issues at the heart of the CIT's decision where it put itself in the role of fact finder and reversed what Commerce had done. First, Kincheller put documentation on the record which purportedly claimed showed that the capitalized assets in the disputed account consisted of foreign exchange losses relating to general company loans. The Commerce Department looked at that using its team of expert forensic accountants. The petitioners looked at the evidence, the documentation, with its expert accountants, was not able to make that link, and Commerce specifically found that that evidence, that documentation did not support the claim that Kincheller made that that account consisted of foreign exchange losses. Well, consisted of foreign exchange losses or consisted of foreign exchange losses attributable to loans not used in connection with the acquisition of an asset? Well, foreign exchange losses relating to general company loans, yes. I mean, which means not company loans specifically dedicated to the acquisition of an asset. Correct. So that's the first issue where... And as far as the evidence, again, there's a complex appendix to work through, but my impression is that the evidence that there was that these amounts represent foreign exchange pretty strong. Would you not agree? No, I would respectfully disagree, Your Honor. I mean, I think the starting point you have to look to is what do the company's own books and records say? Yeah. What do the company's own books and records say that those capitalized assets were not foreign exchange losses relating to general company loans? Well, but leave off the relating to generally company loans, and let's just talk about whether they are foreign exchange losses. Okay. Okay. Do you disagree with me that... I mean, looking at this, I see page after page in which I assume the handwriting was put on before these materials were submitted to Commerce, but the handwriting indicates foreign exchange loans. Well... I mean, foreign exchange losses. Right. Again, the books and records of the company, which is the starting point that Commerce uses, indicated that that disputed account was made up of capitalized assets relating to melt shop modernization, okay? So unrelated... The books and records show it was unrelated to foreign exchange losses. Now, what Akinchiler attempted to do was to submit additional evidence to say, well, wait, we actually misclassified that item on our own books and records. We basically lied on our own books and records as to what that asset was. Commerce looked at that evidence, petitioners looked at that evidence, again, using expert accountants and was not able to tie the documentation to the claim that Akinchiler made that in a disputed account as a capitalized asset, as in fact it had treated it on its own records. Is this contrary to Commerce's normal policy concerning these losses? No, it's not, Your Honor. The situation here that... Well, I mean, I guess that's where you're going. Okay, sure. The situation here was unique because Commerce was confronted with a company that had already capitalized the asset. So the normal situation is during a review, for example, if Commerce comes across a foreign exchange loss, let's assume for purposes of this argument that that is a foreign exchange loss that we're talking about, the general practice typically is to expense that, although there may be exceptions. Here that's not what Commerce was faced with. Here Commerce was faced with the fact that the respondent had already capitalized this entire time period. And so Commerce had to decide at that point, okay, based on our statutory requirement, we have to determine whether that capitalized asset has an effect on period costs. And the respondents here have cited a lot of cases in terms of... or standards in terms of GAAP and international accounting standards to argue that... as well as Commerce cases to argue that they stand for the proposition that you always have to expense foreign exchange losses. The problem is here, that's not what we're dealing with. That foreign exchange loss, again, assuming that's what it was, was already capitalized as an asset. And they have not been able to cite one case or one standard that says that once that's done, you can simply ignore the effect of that, even if there's a benefit in the period of review, which is what we have here. Since you've moved on to that question, explain to me why it is... in your brief, a couple of times you say, well, there's a benefit because there could have been lower borrowing costs by virtue of a falsely enhanced balance sheet. Well, how does that affect the question that Commerce was faced with, which were the actual costs of production? Because if you get a better loan because you lied about your assets, doesn't that just mean that you have lower costs of production? Well, that will affect... I mean, again, this is a factual question that Commerce was in the Commerce realm there. I tell the bank that I'm solvent, in fact, I'm in great shape. The bank says, fine, we'll give you a prime rate loan. And therefore, that prime rate loan, whether I ought to have gotten it or not, is part of my cost of production, right? Correct. Okay, then why is the fact that the balance sheet has led the bank to give me a loan that they shouldn't have given me, why does that affect the cost of production calculation? Well, because the question is... You understand what my concern is. Well, let me see if I can answer you. I believe I do. So the question that Commerce is faced with, again, these are technical, highly complex accounting issues, it has to match a cost to benefits that are incurred in a period. And so what it did here, in terms of its conclusion that you have an inflated balance sheet, was that the benefit that was experienced during the period of review was, for example, as it could attract investment, credit, get better credit terms, that has a direct impact on overall cost. I mean, that's part of the cost that Commerce looks at in terms of production. I mean, that's part of the calculation in terms of the Commerce Department's determination with regard to a margin. It lowers the cost. Yes. So that is a direct effect on cost of production. And if it lowers the cost, then it makes it less likely there's an anti-dumping duty, right? Not necessarily, because what that can do is, if you lower the costs, you can have sales that remain in the foreign market, the comparison market, that otherwise would be kicked out of the calculation. And therefore, it can have exactly the opposite result, Your Honor. That if you lower those costs, otherwise low-priced, for example, sales in the comparison market remain in the calculation, as opposed to dropping out of that calculation. And therefore, it can improve your margin in that regard. So again, I mean, I think the bottom line here is, we're dealing with a very complex issue here. I think this court in Heinex recognized, especially when you're dealing with issues with respect to depreciation, with respect to expensing, that there needs to be substantial deference provided to commerce, because it has unique expertise in these sort of calculations. Consistent with that, the U.S. trade laws themselves provide for a very highly specialized system in terms of resolving anti-dumping allegations. In that respect, the Commerce Department is charged with resolving factual questions. Particularly, again, I know I'm repeating myself, but in these very highly technical accounting issues, I think in particular, that's the case. Whereas the courts that review those decisions are charged with issues relating to the law. One of the issues relating to the law is whether the administrative agency, notwithstanding the complexity and notwithstanding the administrative agency's expertise, has reached a result which is supported by substantial evidence. And I mean, I certainly take your point about the uncontroverted evidence. I'm not sure exactly what the Court of International Trade judge had in mind. I mean, I suppose technically, it was uncontroverted in that there wasn't any evidence being introduced on the other side of the question. It was just a question of whether the evidence that the counselor submitted was sufficient. But there is a question of substantial evidence, and that the judge has to grapple with. It's not only something the judge is trying to do, but he has to. Absolutely. So there was evidence on the other side. Absolutely. There was evidence on the other side, and that was the company's own books and records, how they treated this asset. But certainly, all the evidence pertinent to this came from McKinsel, right? In addition, and I think that's an important point, because here they're asking for a discretionary adjustment. They're asking for an adjustment to deviate from their own books and records. The burden is on McKinsel. The CIT, in the prior appeal on this very issue, recognized that fact, that McKinsel had to come out and provide the evidence. It failed to do so here. But in addition, I think it's important to understand that really there's a two-step process, even if, again, we don't think the record evidence shows that these capitalized assets consist of foreign exchange losses. But even if, and this is what Commerce said, even if they were, the question is still when you capitalize those, treat those as a capitalized asset, do you need to make an adjustment? Do you need to account for that to make sure you've captured it in your period costs? The CIT overruled Commerce. They took that factual issue, and again, this is a very complicated technical accounting issue. And the CIT determined that no, it can have no effect. The CIT is not allowed to do that. It cannot put itself in the role of a fact finder and replace Commerce's decision with respect to whether or not that treatment, again, assuming that it is a foreign, it represents foreign exchange losses, when it's capitalized, does that have an effect? And as we talked about before, it can have a direct effect on the market. All right, well, why don't we save, we'll save your full, I think you asked for three questions. Michael Shore. May it please the Court, my name is Michael Shore of the law firm McArnold & Porter, appearing on behalf of the Akinzler Companies, the respondents in the underlying review before Commerce. I'll pick up where Mr. Shane began, which was his first point, that the department acted consistently with the company's own books and records. And the easy answer to that argument is, that's not enough. It's not enough under the statute, and it's not enough under this court's prior decision in Akinzler 1. This is the second time this issue is before the court. It came up in the preceding 2004-2005 administrative review, late in the preceding, when Akinzler had no chance to present any evidence as to what the account reflected. Commerce rejected the factual evidence, and Akinzler came before the CIT and this court, and the court said as follows, quote, the burden was on Akinzler to create an adequate record as to the disputed account's non-depreciability as a matter of accounting categorization or principle of law. So this court earlier had said, it's not enough to just rely on the fact that Akinzler has this capital asset on its books. Akinzler has the opportunity to come forward with evidence to demonstrate that it did not properly capitalize those expenses in the first place. And that's what we did. Also, under the statute, it's not enough for Commerce to simply say, this is the way it is on your books and records. 19 U.S.C. 1677b permits Commerce to follow Akinzler's accounting treatment only where that accounting is consistent with local accounting principles and reasonably reflect costs. Both the court's prior decision in Akinzler 1 and the statute placed a burden on Commerce to do an analysis of whether the costs were properly capitalized in the first place. And that Commerce didn't do. The burden on Commerce. What if Akinzler's evidence that its own records were not an accurate reflection of the proper characterization of the transaction. What if those, if Akinzler did not persuade Commerce that that was true? Doesn't that fall on Akinzler's shoulders? Akinzler has, well, Commerce must make a factual finding and it must base that finding upon substantial evidence. And that's what the Court of International Trade reviewed. It reviewed the evidence that Akinzler came forward. Petitioners have a funny view of the substantial evidence standard review. It's basically their accountants and Commerce can just sit back and say, keep providing evidence. We're not going to tell you where the deficiencies are. We're not going to tell you what we need. We're not going to tell you where any problems are. And then at the end of the day, we can just say it's not enough. That the statute doesn't permit.  And if there's a deficiency, to notify Akinzler of the deficiency. Commerce never said, we looked at your documents and we can't tie this to that. We don't know where these loan agreements belong. Please provide us more information. They never did that. The only decision they made was at the end of the day to say, it's not enough. And it's not permitted to do that under the statute. This court sits in the position of the Court of International Trade and can review the evidence. I don't know how the petitioner can get up with a straight face and say that there's no evidence that these were exchange losses. Well, but the argument that the petitioner is making is that they weren't exchange losses tied to loans that were not general loans, but rather were. And that's an excellent point because that's the wrong accounting standard. Under the accounting rules, under the all applicable accounting rules, Turkish accounting rules, U.S. generally accepted accounting principles and the international financial standards, there is only a limited circumstance in which exchange losses can be capitalized. They can only be capitalized when they relate to the acquisition or construction of fixed asset during the time that it's being put into service. And there's an additional requirement that the expenses be capitalized in the same account as the asset. So here we have an asset account that has no expenses. It has only these financial expenses. There are no expenses whatsoever in the Kinsler's modernization asset account for the purchase or acquisition or construction of any fixed asset, none. So we didn't have to demonstrate, and Commerce certainly didn't tell us we had to demonstrate, that these relate to general loans. All we had to show was that these were exchange losses and that they did not relate to the purchase of fixed assets. And that we showed. And the Court of International Trade looked at the evidence and... Well, is that... Are you saying that you showed that it was not related to fixed assets because there weren't any fixed assets in the account where they should have been? Because we've already demonstrated that a Kinsler was not following all the rules with respect to where it... We did have fixed... ...how to handle its accounts, right? We showed that there were no expenses in that fixed asset account. Right, but that doesn't get you home, right? Which is a requirement. But it's required, but that doesn't mean that it's correct, right? The second thing we showed was that we provided our entire fixed asset ledger, which showed all the fixed assets that were added over the period of time, and there were no significant fixed assets added in 2001, 2002, 2003, or 2004. Certainly nothing of the magnitude that could generate exchange losses of this magnitude. The trial court, I thought, at least maybe you'd disagree with me on this, but I thought it was unfortunate for the trial court to characterize the Kinsler's evidence as uncontroverted on the nature of the melt shop modernization at the administrative review stage. That seemed to blow right by Congress's whole first point, which is they said, we really aren't able to determine from the material that a Kinsler has given us what this animal is. Well, there's two issues. Under the accounting standards, as I mentioned, we need to show that these were exchange losses and we needed to show that they were not tied to the purchase or construction of a fixed asset. I think the CIT was saying on those two issues that the evidence we submitted was uncontroverted. We provided in our brief citations to all the evidence, it's in the appendix. Even today, Mr. Shane has not cited any controverting evidence. There's nothing that he can cite to show that these weren't exchange losses or that they related to any fixed asset. Just ask them, where's the fixed asset? They can't point to anything. The CIT rightly said that the evidence was uncontroverted because when it came time to  He would say, I think. He probably will have a better answer than my response, but I would think he would say, well, the evidence is they were in the melt shop account. What were they doing there? Right. And the statute- Fixed assets. But as the court said in a Kinsler one and as the statute says, the Commerce Department needs to make a determination as to whether those assets, that that asset account reflects what it says it reflects. Whether the underlying expenses were properly capitalized. Again, I go back to the statutory language. Something else Mr. Shane never talks about, the statute in this case. It talks about the proper allocation of costs. Assets are not costs. Commerce is required by the statute to look beyond the assets to see what the cost is. You don't allocate assets. You don't, cost of production doesn't come from assets. It comes from underlying costs. Commerce's obligation here was to look at the evidence on the underlying costs and make factual findings as to what their nature was. It didn't do that here. Are you suggesting this, are you getting into the point that Mr. Shane and I were discussing as to whether the overstatement of the assets resulting from the failure to depreciate an asset in a capital account resulted in a distortion of the costs? I can address that. The notion that... I thought that's where you were, but... The notion that, as I understand it, that by having this asset on its books and records, which is not a real asset, that a Kinsler has somehow improved its solvency and that provides a benefit in future years. There are at least three problems with that. One that's not a finding commerce made anywhere or a reason commerce applied in its determination. Second, there's no such thing in accounting as a solvency asset. The third problem is, how's that asset used up? Why does it generate an expense in 2005, 2006? If it improves... If a Kinsler has done something to improve its solvency, that's a benefit that continues indefinitely. It's almost akin to goodwill that is not depreciated. Again, commerce treated this as a fixed asset, a depreciable fixed asset, a plant machinery and equipment, which it depreciated over five years because that's the useful life of plant machinery and equipment assets. What's the justification if there is an improved solvency asset for limiting its depreciation over five years? Why not 10 years? Why not 20 years? Why not indefinitely? It's not a depreciable asset. Am I barking up the wrong tree? I was interested in your three-part response because one of the parts, I didn't hear the part that struck me as perhaps an answer, and maybe I'm barking up the wrong tree here, but it strikes me that if I distort my books and claim I have this very valuable asset, which I don't, that doesn't mean that my cost of production is enhanced. That's the fourth point. I fully agree. All right. I don't want to put words in your mouth. If it's not sound, tell me. No, it's absolutely correct. Again, the problem for the petitioners in this case is to explain why this cost that we all agree originated in 2000 and 2001, why that creates a cost of production for steel reinforcing bar, rebar, that Kinsler produced in 2005 and 2006. Unless they can tie it through some piece of evidence to a fixed asset that's depreciable over five years, then they haven't met their burden. To say that the CIT overstepped its authority, I think, isn't correct. Now, I wonder if you could comment on the question of whether the evidence adequately shows a connection between those three loans, I think the four, the five, and the 10.425 million loans and the foreign exchange laws, because that's where I think the evidence gets the fuzziest. Would you agree with that proposition? I would agree with that, because we weren't trying to tie those loans. We were just putting those loans in as evidence that a Kinsler has foreign currency loans that it used for purposes other than purchasing fixed assets. We never intended to tie it out. Our objective in showing that the exchange losses were not related to fixed assets was done through the account itself, which showed no purchase or acquisition of fixed assets, and the fixed asset ledger, which showed that there were no other fixed assets other than those that were listed in the account. We never intended to tie those loan agreements, or if we had, we would have provided all 23 loan agreements. Commerce never asked for additional loan agreements. They never asked us to tie the loan agreements to those particular houses, which we could have. It requires another step, because obviously the original face amount of the loan gets paid off over time, so the balance is not going to tie to what the exchange loss calculation is tied to. Your submission is that even though you didn't establish those complex connections, I understand, but your submission is that nonetheless, those were the loans for which the foreign exchange losses were connected, or to which they were connected. There were 23 loans. Those were three of them. Okay. That's what I was going to ask. Fine. Yes. We do disagree vehemently with the assertion made here and Commerce's finding that the exchange losses account could not be tied to the fixed asset amount that's in the melt shop modernization. That I believe we did on page 18 to 19 of ... I'm sorry, page 28 and 29 of our brief. This is the material that relates confidential joint appendix 123 with 129, 135, 141, and 190. Yes. I mean, to summarize ... Go ahead. Yes. To summarize, we showed the accounting detail for the melt shop modernization account. We showed all of the additions in 2001. We showed that they came from an account called exchange losses on short-term loans. We showed the journal vouchers for those loans. We showed the calculations, and it went into the melt shop account. We showed the melt shop account going into the fixed asset ledger. We showed the total fixed asset amount ties directly to the financial statements. There is no evidence to support Commerce's finding that you cannot tie the Kinsler's records to the financial statements or to the melt shop account. We showed that those exchange losses flowed right through to the financial statement. We showed it before the Court of International Trade, and as to the argument that we never showed that to Commerce, that too is incorrect. You are correct, Judge Bryson. All of those handwritten notations on the documents with the numbers showing the links to the various documents, that was provided to Commerce. There's a written explanation in one of the submissions to Commerce. It was all laid out. Commerce had no interest in looking beyond the existence of the melt shop account. You got to understand the reason why. At the time they were deciding this case, the prior case was on review. If Commerce had come out with a determination saying, we looked at the evidence and we agree with the Kinsler that the evidence shows that these amounts should never have been capitalized, that would have undercut their earlier decision that was already on review. The problem in the earlier case was the Kinsler didn't submit the material in time. We had no opportunity to. We didn't submit it in time. That's right. There was no record, and there is a record here, and that's the difference between this and the earlier case. As to whether the Court of International Trade exceeded its authority, the decision didn't reverse Commerce. The CIT remanded the case to Commerce. Commerce, not the CIT, recalculated the Kinsler's dumping margin. Commerce, not the CIT, recalculated the imputed depreciation expense. Commerce, not the CIT, determined which expenses in the melt shop account related to foreign exchange losses. Well, but Commerce did so with the proverbial gun to its head. Well... I mean, it didn't say, you know, the scales have fallen from our eyes and now we see the truth and we hereby rule in favor of the Kinsler. No. Commerce had the discretion, even after the CIT's decision, to decide that some of those expenses were not included, and they could have continued to impute depreciation on those expenses. Do you think... That was a question that I was left puzzled by. I'm not sure Commerce read the CIT's opinion that way, giving them that freedom. In other words, you think that Commerce could have said, well, the CIT said to us that we should take away the depreciation for, let's see, the language. The amount that currently reflects the foreign exchange losses in the melt shop modernization account, and we could find that there is zero foreign exchange. Do you think they could have done that? Probably not zero, not based on the administrative record, but they could have found that some of them were not demonstrated to be exchange losses, absolutely. We never argued, and the CIT never stated that all of the expenses in that account were exchange losses. On page... On the CIT's decision, Joint Appendix, page 8, and the non-confidential version at the top, the court says that it largely consists of other than foreign exchange losses. And the final sentence, the remand order to Commerce, the court considers Commerce's other arguments without merit, and hereby remands the matter to Commerce for the purposes of redetermining imputed depreciation without the amount that currently reflects the foreign exchange losses in the melt shop modernization account. It was up to Commerce to determine what that amount was. In fact, I remember this very vividly. When Commerce called with the remand results, I asked them, how much of the account did you find was exchange losses? So my reading of the decision certainly was that they had that discretion. And they were also permitted, by the way, on remand, since the CIT did not limit its discretion in any way, they could have reopened the record, they could have asked more questions, they could have conducted a verification, they could have done all the things administrative agencies have the power to do to determine what the amount of the exchange loss was. All the CIT said was that you can't appreciate exchange losses, which, by the way, is Commerce's own policy. Thank you. Thank you, Mr. Schor. And Mr. Shane, let's see, we'll give you your full three minutes, I think. If you need a little more, we'll extend your time. Thank you, Your Honors. Just a couple of quick points. First, again, to emphasize the burden was on Akinchiller to provide the evidence for the discretionary adjustment it was asking for to deviate from the company's own books and records. I think, critically, the respondent here, Akinchiller, did not provide any written explanation explaining how those very complex documents somehow tied and established that that disputed account was made up of foreign exchange losses. There was no explanation provided to Commerce. Again, Commerce, with its experts, petitioners were their experts, was not able to make a link and tie that evidence to the contention that Akinchiller was making. Well, how about the links just in terms of the numbers that show up, and this was in the discussion that we had with Mr. Schor, between confidential JA-123 and the corresponding Melt Shop account, I think that's 129, 135, 141, and 190. You're familiar with this. Yeah. Although, I hesitate to talk about exact amounts because that information is confidential. I understand. You don't have to. But the amounts do match up. Well, I would say, look, the problem is, number one, again, you've got to defer to Commerce in this area. I mean, Commerce has the expertise to look at this and was unable to make that tie-in to the Melt Shop modernization account. It was unable to make that link. There was no narrative explanation. Even though the numbers are the same to the penny between the foreign exchange account and the Melt Shop account. Well, there was no explanation for how you match up and link up those numbers. I mean, how you get from the documents, and this is what Commerce said, how do you get from the documents, the figures in those documents, to the final numbers in the Melt Shop modernization account. Yeah. Okay. Secondly, in terms of the CIT's opinion, I think, I would say, I'm not sure how Mr. Schor got up here with a straight face and argued that the Commerce Department had discretion in terms of how it acted after that remand order. What the CIT found was that the disputed account was made up of, quote, almost solely foreign exchange losses. It then further went on to order the Commerce Department to recalculate the dumping margin without imputing any depreciation to foreign exchange losses in that account. What that amounts to and how Commerce interpreted it, or any reasonable person would interpret that, is in order to recalculate the margin without imputing depreciation. There was no leeway there for the Commerce Department to somehow determine that part of that account was not made up of or comprised of foreign exchange losses. Its hands were tied. It said as much in its remand determination, and the CIT affirmed that decision and made  it recognize that that's what it had ordered Commerce to do.